**SIGNED THIS: January 27, 2011**

**THOMAS L. PERKINS**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

IN RE:                              )
                                    )
**RICHARD L. ECKBERG, SR.,**        )        No.  10-81914
                                    )
                    Debtor.         )

### O P I N I O N

        This matter is before the Court on a motion filed by Northern Grain Marketing, LLC

(NGM) for allowance of an administrative priority claim under section 503(b) of the

Bankruptcy Code.   The motion is opposed by the Debtor, Richard L. Eckberg, Sr.

(DEBTOR), and by creditor Manlius Oil Company, Inc.

### Factual and Procedural Background

        The DEBTOR, a grain farmer, filed a Chapter 12 petition on June 14, 2010,

scheduling 1,400 acres of growing crops including corn and soybeans.  Peoples National

Bank of Kewanee (PNB) is scheduled as holding a blanket lien on farm assets including the

growing crops.  NGM asserts that it is a licensed "grain dealer" as defined in the Illinois

Grain Code, 240 ILCS 40/1-1 *et. seq.*, and that its business is subject to the requirements of

the Grain Code and applicable regulations promulgated by the Illinois Department of Agriculture. The Grain Code defines "grain dealer" to mean a person who is licensed by the Department to engage in the business of buying grain from producers. 240 ILCS 40/1-10.

It is undisputed that ten executory grain contracts were entered into between the DEBTOR and NGM, four before bankruptcy and six after. NGM generally characterizes all ten contracts as "forward contracts" for the purchase of a commodity as defined in section 101(25) of the Bankruptcy Code. The DEBTOR asserts that of the ten contracts, three are "hedge-to-arrive contracts," five are "futures contracts," one is a "basis contract" and one is a "cash contract." For reasons that follow, although a rudimentary understanding of the various types of contracts is helpful, resolving NGM's application does not require the determination of whether the contracts are forward contracts or futures contracts or, if forward contracts, exactly what type of industry-defined forward contract each really is. NGM's application must be denied no matter what type the contracts are.

When the DEBTOR filed his bankruptcy schedules, he failed to list NGM as a creditor. As a result, NGM did not receive notice of the bankruptcy filing from the Court. Pursuant to a stipulated order entered September 7, 2010, to resolve PNB's motion for stay relief, the DEBTOR agreed to relinquish his entire interest in the 2010 growing crops to PNB, subject to payment of landlord liens. The order provides that the harvested crops would be sold through NGM.

Ten days later, on September 17, 2010, NGM filed its motion, alleging that it had no notice or knowledge of the bankruptcy case until September 10, 2010, when it received a

2

phone call from PNB's attorney.  In its pleading, NGM acknowledges a prior course of dealing whereby the DEBTOR would routinely deliver grain to NGM for which NGM would issue two-party checks payable jointly to the DEBTOR and PNB.  Among other forms of relief, NGM requested that it be granted "a priority administrative claim pursuant to 11 U.S.C. §§ 503(b) and 507 to the extent of damages incurred as a result of any failure by Debtor to honor the [10] open forward grain contracts."  NGM calculated the total damages to be $428,875.00, comprised of $200,100.00 from the prepetition contracts and $228,775.00 from the postpetition contracts.

The cryptic contracts do not contain any provisions regarding termination, remedies or damages (although each contract incorporates the rules issued by the National Grain and Feed Association).  NGM calculates its damages by determining the spread between the "contract price" and a subsequent price labeled as "now." It then multiplies that spread by the number of bushels to be delivered.  To that figure, it then adds a cancellation fee calculated by multiplying a per bushel fee by the number of bushels.  For eight of the contracts, the fee is five cents per bushel.  For the remaining two contracts, however, the cancellation fee is $1.16 per bushel and $1.26 per bushel respectively.  Whether NGM's damages have been properly calculated as a matter of contract is a question the Court does not have to determine at this stage.[1]

On September 30, 2010, NGM filed a motion to compel the DEBTOR to assume or reject the prepetition contracts and to "immediately state his intentions" regarding

---

[1]It is not clear, for example, whether the cancellation penalty incurred by a farmer who cannot make delivery is the buyer's exclusive remedy.  It could also be the case that termination of one or more of the contracts actually resulted in a benefit to NGM.  The computation of NGM's damages may be necessary if it files a proof of claim that draws an objection.  However, rule 29 of the NGFA Grain Trade Rules makes arbitration the "sole remedy" to resolve disputes related to covered transactions.

performance of the postpetition contracts, reiterating its demand for administrative priority status for its contract damages.  On October 1, 2010, the DEBTOR moved to reject his prepetition contracts with NGM, and later, on October 11, 2010, to reject his postpetition contracts with NGM.  Following a hearing, orders were entered granting the rejection of all of the NGM contracts, prepetition and postpetition.

The 2010 crops were harvested and sold through NGM at spot prices, with all expenses paid, and net proceeds credited to the DEBTOR'S loan balances with PNB.  It is not disputed that NGM received delivery of at least a portion of the DEBTOR'S 2010 crops.

### Forward Contracts

Long gone are the days when a farmer would harvest his crops in the fall and then sell them to whichever local elevator was offering the best price.  It is still possible to farm that way, but few do.  A cash for crop transaction for the immediate and simultaneous sale and delivery of the commodity is known as a "spot" transaction.  Relying on spot sales leaves the farmer vulnerable to selling "low" if supply is strong and prices are weak.

Most farmers nowadays sell crops via "cash forward" transactions where an agreement for sale is entered into but delivery of the crops is deferred or pushed forward to a future date or period.  A simple cash forward contract allows a farmer to lock in a favorable price in July, say, for delivery of grain in November.  Cash forward agreements contemplate the eventual, actual delivery of the commodity, a cash for crop transaction, at a future date. *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 971 (4th Cir. 1993).  Cash forwards, which are unregulated, are generally distinguishable from "futures" contracts where actual delivery is not likely to occur. *Andersons, Inc. v. Horton Farms, Inc.,* 166 F.3d 308, 318 (6th Cir. 1998).  Futures contracts, considered to be price speculation devices, are strictly

4

regulated under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, requiring that futures contracts be sold through commodity exchanges by registered futures commission merchants. *Nagel v. ADM Investor Services, Inc.*, 217 F.3d 436, 439 (7th Cir. 2000).

Common in the industry are several different varieties of forward contracts, including Fixed Price contracts, Basis contracts and Hedge-to-Arrive ("HTA") contracts. The simplest and least risky are Fixed Price contracts where the seller and buyer agree at the beginning on quantity, quality, delivery terms and the price for grain to be delivered at a fixed time in the future. *Andersons, Inc.*, 166 F.3d at 319.

The more common, and riskier, method for a farmer to sell grain is with delayed pricing terms that involve two components.[2]  The Chicago Board of Trade ("CBOT") establishes a "futures reference price for grain at a specific time in the future, which serves as a national price." *Id.*  A local cash basis level is an adjustment to the national price that reflects local variables such as the cost of transportation, storage, labor and utilities. *Id.; Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 779 (7th Cir. 1999).  In Basis contracts, in addition to quantity, quality and delivery terms, the parties initially agree only on the local basis, leaving the futures reference price for later determination. *Andersons, Inc.*, 166 F.3d at 319.

In HTA contracts, the parties agree to a price per bushel set by reference to the CBOT futures price for a particular month, plus or minus the local basis.  The futures reference price is fixed at the time of contracting, but the basis floats until the farmer

---

[2]The Grain Code defines "price later contract" to mean a contract for the sale of grain that permits any part of the purchase price to be set by the seller after delivery. 240 ILCS 40/1-10 and 10-15.  The nine open price contracts between the DEBTOR and NGM do not appear to be price later contracts as they require the price to be set before delivery. Whether they are or are not price later contracts is not material to resolution of NGM's motion.

decides to fix it, prior to an agreed pricing deadline. If the farmer fails to timely fix the basis, it is set automatically by the terms of the HTA. *Lachmund,* 191 F.3d at 779.

The HTA is a cash marketing contract that offers grain producers the opportunity to lock in a referenced futures price when it is considered attractive. To avoid the future price risk, the grain merchant hedges the grain in the futures market, specifies a date for the delivery by the farmer, and allows the farmer to fix the basis prior to or on the date of delivery. Hedging is accomplished by taking a position in the futures market opposite to the contract position. A buyer hedges by establishing a "short" position (an obligation to sell) for the contract month of delivery to offset its obligation to buy from the farmer. *Id.*

In an even more complicated, and risky, twist, some HTAs are flexible in that they permit the farmer to "roll the hedge." Rolling the hedge permits the farmer to elect to change the contract delivery date by paying a roll fee to the buyer. *Nagel,* 217 F.3d at 439. When a farmer rolls the delivery date forward, the buyer correspondingly rolls his hedge forward by cancelling or offsetting the first short contract and establishing a new short position in the new month of delivery. The price difference or "spread" between the old and new futures months is added to the price per bushel of the HTA. The farmer absorbs the spread whether it is positive or negative. *Lachmund,* 191 F.3d at 780.

The principal feature of all delayed pricing terms is the farmer's ability to attempt to time the market by speculating on the rise or fall of prices. With that potential advantage comes the risk of guessing wrong about which way prices are headed. *Nagel,* 217 F.3d at 439. Among the types of HTAs, non-roll HTAs are the least risky with risk increasing as to intra-year rolling HTAs, HTAs with inter-year rolling involving one year's

production, and multi-year rolling HTAs.  Robert Wisner, *Understanding Risk in Hedge-to-Arrive Contracts,* Iowa State University Extension, release PM-16976 (Jan. 1997).

## Analysis

Cryptic in nature, most of the NGM contracts include a delayed pricing term and permit the DEBTOR to roll the hedge.  All of the contracts purport to require the DEBTOR to deliver grain to NGM.  However, the two contracts entered into in October, 2009, don't require delivery until December, 2011, two years ahead, which could indicate that they are futures contracts.

Curiously, NGM doesn't expressly acknowledge receipt of the DEBTOR'S 2010 crops.  The three contracts for soybeans required delivery in October and November, 2010, of a total of 60,000 bushels.  Pursuant to the sale of the DEBTOR'S crops by PNB, as authorized by the Court, NGM received 62,275 bushels of beans, slightly more than the DEBTOR agreed to deliver.  The five contracts for 2010 delivery of the DEBTOR'S corn, required delivery in December, 2010, of a total of 130,000 bushels of corn.  According to the report filed by PNB, 49,546 bushels of corn were delivered to NGM, although the report states that a total of 71,549 bushels of corn were harvested.  The shortfall is unexplained. In any event, it appears that NGM received slightly more beans than the DEBTOR'S contracts required, and a substantial amount, but not nearly all, of the amount of corn contracted for delivery.  NGM admits that its alleged damages are for the DEBTOR'S breach (through rejection) of the contracts, calculated on the basis of a price spread.  It is not clear, however, what "profit" NGM would have realized had the contracts been

assumed and completed by the DEBTOR. Likewise, it is not clear whether the price spread used for NGM correctly reflects its actual loss from termination.[3]

The Bankruptcy Code draws a clear distinction between damages arising from a debtor's rejection of an executory contract and value added to or preserved for the estate on account of a creditor's postpetition performance under an executory contract. Damages resulting from rejection of an executory contract are properly classified as a nonpriority unsecured claim. *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188 (1984). If a debtor in possession assumes an executory contract, the liabilities incurred in performing the contract may be treated as administrative expenses. *In re FBI Distribution Corp.,* 330 F.3d 36, 42 (1st Cir. 2003). If the contract is rejected, however, the contract is deemed breached on the day before the date of the filing of the petition. 11 U.S.C. § 365 (g)(1). Any claim arising from such rejection is required to be treated "as if such claim had arisen before the date of the filing of the petition," 11 U.S.C. § 502(g)(1), that is, as a general unsecured claim not entitled to priority.[4] *In re Stewart Foods, Inc.,* 64 F.3d 141, 144 (4th Cir. 1995).

Where the debtor in possession, however, induces a nondebtor to render performance pursuant to an unassumed prepetition executory contract, pending its decision to reject or assume, the nondebtor party may be entitled to administrative priority,

---

[3]A related issue is whether NGM's loss, if any, was properly mitigated, via cancelling or honoring its hedge, or otherwise. For example, a forward contract merchant's exercise of remedies provided by contract or rule is not stayed. 11 U.S.C. § 556. Additionally, because of the interrelationship among contracts, all of the contracts related to the DEBTOR'S ten, would have to be netted out in order to evaluate the net effect the rejections had on NGM. The automatic stay does not prevent a forward contract merchant from offsetting or netting out the positions on related contracts. 11 U.S.C. § 362(b)(6).

[4]The timing of the determination of damages resulting from rejection or termination of a forward contract may vary depending upon the availability of commercially reasonable determinants of value under section 562 of the Bankruptcy Code.

but only to the extent that the consideration supporting the claim was supplied to the debtor in possession during the reorganization and was beneficial to the estate. *FBI Distribution Corp.*, 330 F.3d at 42-43. The timing of when the creditor's right to payment arises is not as important as the necessity that the consideration provided by the creditor occurs postpetition so that value is provided to the debtor in possession for the benefit of the estate. *Id.* at 43.

Rejection of an unexpired lease or executory contract does not effect its termination; the parties' rights post-rejection continue to be governed by the terms of the contract and ordinary principles of state law. *Capital One, N.A. v. City of Alexandria,* 439 B.R. 379, 397 (W.D.La. 2010). What rejection does accomplish is to free the estate from the obligation to perform, so a rejected contract or lease is treated as abandoned and no longer a part of the bankruptcy estate. *In re Old Carco LLC,* 424 B.R. 633, 638-39 (Bankr.S.D.N.Y. 2010). The purpose of treating a rejection as a prepetition breach is to allow the nondebtor party to have a general unsecured claim payable to the same extent as other prepetition debts. *Id.* at 639.

The option to reject a contract or lease gives the debtor in possession the opportunity to be relieved of burdensome obligations. Likewise, the option to assume provides the opportunity to preserve rights that are beneficial to the estate with the *quid pro quo* being acceptance of the contract liabilities that accompany those benefits. But the very purpose of rejection is to avoid incurring additional administrative expenses that lack a corresponding benefit to the estate. *In re Ames Dept. Stores, Inc.,* 306 B.R. 43, 51-52 (Bankr.S.D.N.Y. 2004).

For administrative priority purposes, the analysis is the same whether the executory contract is formed prepetition or postpetition. Just because a contract is entered into postpetition does not eliminate the conditions to administrative expense treatment under section 503(b)(1)(A). *In re Chugiak Boat Works, Inc.,* 18 B.R. 292 (Bankr.D.Alaska 1982). It has been held, however, that contracts first entered into postpetition by a debtor in possession are not "executory contracts" of the debtor and are not governed by section 365. *In re IML Freight, Inc.,* 37 B.R. 556 (Bankr.D.Utah 1984). Whether NGM's claim for damages resulting from the DEBTOR'S repudiation and termination of the postpetition contracts, not allowed and paid as an administrative priority, should be treated as a prepetiton claim in this Chapter 12 case remains an open question.

Courts agree that an administrative expense has two defining characteristics: (1) the expense and right to payment arise after the filing of bankruptcy, and (2) the consideration supporting the right to payment provides a benefit to the estate. *In re Midway Airlines Corp.,* 406 F.3d 229, 237 (4th Cir. 2005); *Matter of Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir. 1984). The statutory language of section 503(b) suggests a *quid pro quo* by which the estate accrues a debt in exchange for some consideration necessary for the operation, rehabilitation or preservation of the estate. *Pennsylvania Dept. of Environmental Resources v. Tri-State Clinical Laboratories, Inc.,* 178 F.3d 685, 689-90 (3rd Cir. 1999). The purpose of the priority is to compensate the providers of necessary goods, services or labor. *Id.* at 690; *Jartran,* 732 F.2d at 586. The applicant bears the burden to establish the benefit to the estate. The parties present the issue as one that may be resolved on the record now before the Court.

The contracts with NGM require the DEBTOR to deliver and sell a specified quantity of harvested crops (corn or beans) to NGM, and require NGM to purchase that quantity from the DEBTOR. The contracts specify a month and year for delivery, but several of the contracts permit the delivery period to be rolled. All of the contracts but one provide that the price NGM will pay is to be set in the future. No goods, services or labor is contemplated to be provided by NGM to the DEBTOR. The sole consideration to be provided to the DEBTOR by NGM is payment for grain upon delivery.

Prior to rejection, no amounts were paid by NGM to the DEBTOR; in other words, NGM did not prepay its payment obligation. So it provided no consideration to the bankruptcy estate. Notwithstanding the absence of value given to the estate by NGM in goods, services or labor, NGM contends that the DEBTOR benefitted because the "forward grain contracts were executed to guarantee the debtor-in-possession that upon delivery of the corn and soybeans to NGM, there would be payment." This argument necessarily, and incorrectly, presumes that the DEBTOR would not be able to sell his grain on the spot market.

Delayed pricing agreements permit the farmer to speculate whether futures prices or the local cash basis level will rise or fall over time. If the farmer's prediction about the future is correct, he benefits by selling his crop for a better price than if he had locked in a current price when the contract was formed. But the benefit is not realized until the crop is delivered and the purchase price received. Until then, the benefit is merely an expectancy or potential benefit. But actual benefit, rather than potential benefit, to the estate is required. *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994). Priority

entitlement is measured by the quantifiable benefit that flows to the estate, not the amount of loss suffered by the claimant. *Id.; In re Magnolia Gas Co., L.L.C.,* 255 B.R. 900, 916 (Bankr.W.D.Okla. 2000).

This point is illustrated in *In re National Steel Corp.,* 316 B.R. 287 (Bankr.N.D.Ill. 2004), where the creditor requesting the administrative expense claim had a contract to purchase steel from the debtor at predetermined prices. After filing Chapter 11 bankruptcy, the debtor unilaterally increased its prices by eighteen percent. The creditor continued to purchase steel at the higher prices although it considered the arbitrary price increases to constitute a breach of the contract. Based on the alleged breach, the creditor asserted an administrative expense claim for the amount that it overpaid above the set contract rates.

The court first noted that the claim was "not the typical scenario wherein a creditor provides goods or services to the debtor and the creditor seeks payment for those goods or services as an administrative expense claim." Instead of the usual situation where a debtor fails to pay a creditor for postpetition goods or services, both parties performed under the contract – the debtor provided steel and the creditor paid for it, "albeit at a price higher than the one provided for" in the contract. *National Steel,* 316 B.R. at 300. With respect to the issue of benefit to the estate, the court determined that the creditor's purchase of steel at a higher price was not the kind of benefit to the operation of the debtor's business required by section 503(b)(1)(A), reasoning that a consensual "overpayment" was not an actual, necessary cost or expense incurred by the creditor of preserving the debtor's estate. *National Steel,* 316 B.R. at 301. The administrative priority claim was rejected even though the estate received the higher price from the purchaser. In the case at bar, not only was a

12

surplus payment not received from NGM, no payment at all was received by the bankruptcy estate.

In this Court's view, the NGM contracts that contain a delayed pricing provision are either price risk avoidance or price speculation devices that provided no quantifiable benefit to the estate of the kind required for administrative claim status. (If the contracts were beneficial to the estate, why were they rejected?) There may have been the possibility of a future benefit, realizable at the time of delivery and payment, but the rejection of the contracts eliminated that possible benefit.

As to the one Fixed Price contract, the DEBTOR chose to fix the price well in advance of harvest and delivery. Under this contract, the DEBTOR hoped prices would fall and risked that prices would rise. Prices rose, so the fixed price contract was a detriment, not a benefit, to the estate.

NGM makes much of the DEBTOR'S failure to list it as a creditor meaning NGM got no notice of the bankruptcy filing. It suggests that this failure was intentional and should be taken into consideration on the issue of administrative priority, particularly since six of the contracts were entered postpetition when NGM was unaware of the filing. The Court does not agree.

Administrative priority claims are narrowly construed for the reason that allowance of such claims works to the disadvantage of other creditors and hinders the chance of a successful reorganization. *In re Ames Dept. Stores, Inc.,* 306 B.R. 43, 54 (Bankr.S.D.N.Y. 2004). Even if the DEBTOR wilfully failed to schedule NGM or otherwise advise NGM of the filing, that conduct should play no role in the administrative priority claim analysis.

NGM also contends that the stipulated order allowing PNB to harvest the 2010 crop impaired its contract rights. Given PNB's delivery of the crops to NGM, NGM's argument is unsustainable. Moreover, a security interest in crops is customary in the industry, and NGM was aware of PNB's interest through its prior course of dealing with the DEBTOR. The Court fails to see how NGM suffered because of PNB's interest.

NGM questions the DEBTOR'S right to enter into postpetition grain contracts. Under section 1203, however, a Chapter 12 debtor has the right to continue to operate the farm business, including the right to enter into contractual obligations that are undertaken in the ordinary course of business, without notice or hearing. 11 U.S.C. § 363(c)(1). Moreover, even if the "rejection" of the postpetition contracts was unnecessary, the event of rejection is irrelevant to the issue of administrative priority.[5]

Even if NGM has suffered financial harm as a result of the rejection of the contracts, a determination that the Court does not make at this juncture, its contract damages are not eligible for administrative priority treatment because the estate received no benefit.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

### ###

---

[5] If the postpetition contracts are not executory contracts covered by section 365, the DEBTOR would be able to repudiate them without following the rejection procedures contained in the Code and Rules.